IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| **LIVE FACE ON WEB, LLC,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**TWEOPLE, INC.; TWENTY FIRST CENTURY HEALTH CARE CONSULTANTS, INC.; ADS CONSULTING CORPORATION, INC.; MAGIC VILLAGE LLC; MR. CHECKOUT DISTRIBUTORS, INC.; ENLIGHTENED CAPITALISM LLC; FLORIDA EB5 INVESTMENTS LLC; SOUTHERN CREMATORY, INC.; COMFORT-N-MOBILITY, INC.; CLINGAN CAPITAL FUNDING, LLC; ROBERT W. ASTLES, D.M.D., P.A.; THE FAMILY VENDING CO. INC.; VICTOR V. GAMMICHIA, D.D.S., P.A.; HELICAL PRODUCTS COMPANY, INC.; UNITED CALIFORNIA DISCOUNT CORPORATION; CBS CORPORATION; DYDACOMP DEVELOPMENT CORP.; DOAN LAW FIRM P.C.; ZK TECHNOLOGY LLC; BARBA CONSULTING INC.; EXPRESSCARE LLC,**<br><br>**Defendants.** | Case No.: 6:14-cv-44-Orl-22TBS |

**MOTION FOR FINAL DEFAULT JUDGMENT AGAINST
MR. CHECKOUT DISTRIBUTORS, INC., SOUTHERN CREMATORY, INC. and
ROBERT W. ASTLES, D.M.D., P.A.**

Plaintiff, Live Face on Web, LLC ("LFOW"), requests the Court enter final default judgment against Mr. Checkout Distributors, Inc. ("Mr. Checkout"), Southern Crematory, Inc. ("Crematory") and Dr. Robert W. Astles, D.M.D, P.A. ("Astles") (referred to collectively as the

1

"Defaulted Defendants"), pursuant to Rule 55(b), and in support thereof shows the Court as follows:

## I. THE LFOW SOFTWARE

LFOW is a developer and owner of "live person" software, which is an original work of authorship independently created by LFOW ("LFOW Software"). (Doc. 1, ¶30.) LFOW owns the copyrights to the LFOW Software, three of which have been asserted in this action. (*Id*. at ¶¶38, 155.) The LFOW Software allows a company to display a video of a "walking" and "talking" personal host who introduces a website to an online visitor. (*Id*. at ¶31.) The personal host is, in effect, a web spokesperson for the specific company for whom the video has been created. (*Id*.) Typically the web spokesperson explains a company's products and/or services and directs a visitor's attention to a particular product or aspect of the website. (*Id*.) The LFOW Software is used to advertise services and solicit business through the use of a website spokesperson, which is typically tailored to specific products and services found on the associated website. (*Id*.)

The LFOW Software enables a company to customize and dynamically modify settings and functionality of the web spokesperson, providing many benefits to users of the LFOW Software. (*Id*. at ¶32.) For example, a customer utilizing the LFOW Software can: (a) manipulate the positioning of the web spokesperson on its website and select between static, relative or dynamic positioning features; (b) adjust the delay between the time an online visitor enters the website and the start time of the web spokesperson's presentation; (c) select the number of times a video presentation plays for each particular visitor; and (d) select "click on me" functionality that directs a user to a predetermined page or section of the website which promotes goods or services and/or reinforces the image and brand of the customer. (*Id*.)

The LFOW Software enhances a web site by using the web spokesperson video to capture, hold and prolong the attention of the average online visitor, enhancing the ability of the website to advertise specific products and services. (*Id*. at ¶33.) This technique has a direct positive impact on sales and/or the brand, public image and reputation of any company that has an online presence. (*Id*.) Some customers of LFOW have enjoyed double digit increases in web signups and sales as a result of the use of the LFOW Software, while others have reported increases of 24-60% in lead capture ratios. (Declaration of Eduard Shcherbakov, Ex. A, ¶3; Ex. 1 to the Shcherbakov Decl., p. 35-36.)

## II.  THE DEFAULTED DEFENDANTS

1. On January 10, 2014, LFOW commenced this action by filing a complaint for copyright infringement and trademark infringement. (Doc. 1.)

2. Count III was asserted against the Defaulted Defendants. (Doc. 1.)

3. On January 10, 2014, the Clerk issued a Summons directed to Mr. Checkout. (Doc. 6.) Mr. Checkout was served on February 4, 2014, and an affidavit of service was filed with the Court on February 27, 2014. Mr. Checkout failed to file a timely answer or otherwise respond to the allegations of the complaint, and on February 27, 2014, LFOW moved for entry of Clerk's Default. (Doc. 47.) On February 28, 2014, the Clerk entered a Default as to Mr. Checkout. (Doc. 49.) As of this date, Mr. Checkout has not filed any response to the complaint or otherwise appeared in this litigation.

4. On January 10, 2015, the Clerk issued a Summons directed to Crematory. (Doc. 9.) Crematory was served on January 24, 2014, and an affidavit of service was filed with the Court on February 27, 2014. Crematory failed to file a timely answer or otherwise respond to the allegations of the complaint, and on February 27, 2014, LFOW moved for entry of Clerk's

Default. (Doc. 43.) On February 28, 2014, the Clerk entered a Default as to Crematory. (Doc. 48.) As of this date, Crematory has not filed any response to the complaint or otherwise appeared in this litigation.

5. On January 10, 2014, the Clerk issued a Summons directed to Astles. (Doc. 12.) Astles was served on January 28, 2014, and an affidavit of service was filed with the Court on July 29, 2014. Astles failed to file a timely answer or otherwise respond to the allegations of the complaint, and on July 29, 2014, LFOW moved for entry of Clerk's Default. (Doc.240.) On July 30, 2014, the Clerk entered a Default as to Astles. (Doc.241.) As of this date, Astles has not filed any response to the complaint or otherwise appeared in this litigation.

6. A Default Judgment has the effect of establishing as fact LFOW's well-pled allegations in the Complaint, and bars the Defaulted Defendants from contesting those facts on appeal. *See Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1 987).

7. A hearing is unnecessary to determine LFOW's damages since LFOW has submitted a detailed declaration in support of its Motion for Final Default Judgment. *See Thompsons Film, LLC v. Velez*, 2014 U.S. Dist. LEXIS 102590, *10 (M.D. Fla. June 5, 2014)("A hearing is not necessary if a party submits sufficient evidence to support the request for damages."), citing *SEC v. Smyth,* 420 F.3d 1225, 1232 n.13 (11th Cir. 2005).

### III.   LIABILITY IS ADMITTED

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Baby Buddies, Inc. v. Toys R Us, Inc.*, 611 F.3d 1308, 1315 (11th Cir. 2010) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296 (1991)). "Copying is a shorthand reference to the act of infringing any of the copyright owner's . . . exclusive rights set

forth at 17 U.S.C. § 106." *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002) (internal citation and quotation omitted). The exclusive rights in 17 U.S.C. § 106 include: the right "(1) to reproduce the copyrighted work in copies . . . ; (2) to prepare derivative works based upon the copyrighted work; [and] (3) to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."

As set forth in the Complaint, LFOW owns the valid copyright registrations TXu001610432, TXu001610441, and Tx 7-605-244. (Doc. 1, ¶142, 167.) Tweople created infringing derivative works from the LFOW Software that is protected by these copyright registrations, and distributed copies of the infringing copies of LFOW's Software. (Doc. 41, 44, 48-50.) Each of the Defaulted Defendants owns and operates a website that promoted their respective goods and services. (Doc. 1, ¶71, 73, 83, 85, 99, 101.) When individuals visited the website of each Defaulted Defendant, a copy of the infringing version of the LFOW Software was improperly distributed by the Defaulted Defendants. (Doc. 1, ¶48-50, 74, 86, 102, 144, 169.) This Court has found that, to the extent the infringing version of the LFOW Software was hosted by a particular defendant, the complaint properly pleads a claim for direct copyright infringement. (Doc. 223, p. 6[1]) Accordingly, direct infringement by Tweople is established based on the facts pled in the complaint and admitted by default. *See Buchanan*, 820 F.2d at 361. Likewise, because Defendant Astles also hosted the infringing code on its own website (Ex. A, ¶17), Astles is a direct infringer. *See id.*

Vicarious liability arises "when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks

---

[1] "Thus, Plaintiff has successfully pleaded a claim for direct infringement against the Tweople customers that hosted the infringing code themselves, but not against those customers for whom Tweople hosted the code."

5

knowledge of the infringement." *BUC Int'l Corp. v. Int'l Yacht Council, Ltd.*, 489 F.3d 1129, 1138 n.19 (11th Cir. 2007). (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 n.9, 125 S. Ct. 2764, 2776 n.9 (2005)). It is noteworthy that this Court has already concluded that the Complaint sufficiently alleges vicarious infringement (as well as direct infringement for those defendants that hosted their own code). (Doc. 223, p. 7.) Tweople sold packages that included the infringing software (hosted on Tweople's website) and videos tailored to the specific business of each Defaulted Defendant, which were displayed on each Defaulted Defendant's website by the infringing version of the LFOW Software. (Doc. 1, ¶47-48.) Each of the Defaulted Defendants had the right and ability to supervise the infringement but failed to do so, because the website of each directed visitors to the location of the infringing code and caused the distribution of the infringing LFOW Software. (Doc. 1, ¶50, 169.) In other words, because each of the Defaulted Defendants owned and controlled its respective website, each Defaulted Defendant therefore had the right and ability to both supervise and stop the distribution of the infringing versions of the LFOW Software, but failed to do so. (Doc. 1, ¶48-50, 169.)

To establish a direct financial interest, there need only be a "causal relationship between the infringing activity and any financial benefit the defendant reaps," and the "financial benefit need not be tied directly to sales of the infringing goods." *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011) (citing *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996)). "Financial benefit exists where the availability of infringing material 'acts as a "draw" for customers.'" *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001), quoting *Fonovisa.*, 76 F.3d at 263-64. "[C]ourts seem to have relaxed [the financial benefit] standard over time. . . . Indeed, [one district court has held] that, even absent the receipt of any revenues whatsoever, a

future hope to 'monetize' suffices. It seems scarcely an exaggeration to posit that an obvious and direct financial interest is now understood to encompass a possible, indirect benefit." 3 Nimmer on Copyright § 12.04.

Each of the Defaulted Defendants had a direct financial interest in infringement, as each profited from the distribution of the infringing LFOW Software, which allowed each to more effectively promote and sell its products and services by capturing, holding and prolonging the attention of the average online visitor, providing a direct positive impact on sales and/or the brand, public image and reputation of each Defaulted Defendant's customers. (Doc. 1, ¶50.) Moreover, by contracting with Tweople, which copied the LFOW Software to avoid the costly development of its own software (*id.* at 46), each Defaulted Defendant paid less than the comparable price it would have paid to LFOW (Ex. A, ¶6), thereby providing each Defaulted Defendant with the financial benefit of the LFOW Software without having to pay LFOW. (Doc. 1, ¶169.) These benefits included some of the same benefits paid by LFOW's paying customers, including increases in web signups, lead capture and sales. (Ex. A, ¶6; Ex. 1, p. 35-36.) Accordingly, vicarious has been established as to both Mr. Checkout and Crematory by virtue of the admitted allegations in the complaint. *See Buchanan*, 820 F.2d at 361.

Notably, although the admitted allegations of the complaint establish liability of each Defaulted Defendant (and Tweople), the Court need not necessarily resolve the direct infringement of Tweople. A defendant can be held liable for indirect infringement without a determination of direct infringement; instead, "it is permissible for a plaintiff to name as a defendant solely a contributory infringer or one vicariously liable" 3 Nimmer on Copyright § 12.04. In *Sony v. Universal City Studios*, 464 U.S. 417, 434 (1984), the Supreme Court recognized that a plaintiff need not even seek relief against a direct infringer in order to assert

7

claims of indirect infringement. In *Danjaq, S.A. v. MGM/UA Communications Co.*, 773 F. Supp. 194, 201 (C.D. Cal. 1991), the Central District of California specifically addressed this issue, rejecting the notion that "the primary infringer must be a co-defendant in the case." On the contrary, the *Danjaq* decision recognized "there may be many reasons why a [direct infringer] may not be held accountable for its conduct in court…" *Id.*; *see also Design Craft Fabric Corp. v. Spring Tex, Inc.*, 1999 U.S. Dist. LEXIS 19630, * (N.D. Ill. Dec. 21, 1999) ("courts have held that alleged direct infringers [ ] do not have to be liable or even known for the third party [ ] to be liable for contributory infringement."); *Curb v. MCA Records, Inc.*, 898 F. Supp. 586, 595 (M.D. Tenn. 1995). The Court should, therefore, find each of the Defaulted Defendants liable for copyright infringement, whether directly (for Astles) or indirectly (for Mr. Checkout and Crematory).

## IV. CALCULATION OF DAMAGES

Pursuant to 17 U.S.C. §504(a), an infringer of a copyright is liable for damages as follows:

> (1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or
> (2) statutory damages, as provided by subsection (c).

In determining damages under §504(a)(1), the copyright owner is entitled to both actual damages and the infringer's profits, to the extent profits are not duplicative of actual damages. *See* 17 U.S.C. §504(b). "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* As set forth above, the LFOW Software has a proven track record of increasing revenue for licensees, and certainly the Defaulted Defendants also enjoyed increased

8

profits directly attributable to infringement. However, without the benefit of discovery, LFOW cannot reasonably calculate the profits of each Defaulted Defendant. Accordingly, LFOW only seeks its actual damages, as calculated by the standard license fees charged by LFOW as alleged in the complaint[2]. (Doc. 1, ¶36, 169.)

"The Court has wide discretion in assessing these damages, which may be awarded even when they are not susceptible to precise calculations." *Nutrivida, Inc. v. Inmuno Vital, Inc.*, 46 F. Supp. 2d 1310, 1315 (S.D. Fla. 1998)(citing *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1564-65 (11th Cir. 1986)); *Axiom Worldwide, Inc. v. HTRD Group H.K. Ltd.*, 2013 U.S. Dist. LEXIS 77650 (M.D. Fla. June 1, 2013). "A classic element of the plaintiff's copyright damages is the profits the plaintiff would have earned from third parties, were it not for the infringement." *Davis v. Gap, Inc.*, 246 F.3d 152, 167 (2d Cir. N.Y. 2001), citing 4 Nimmer § 14.02 A, at 14-9 to 10. "[A] copyright owner is permitted to recover his own 'actual damages,' including lost profits and 'reasonable royalty rates.'" *MGE UPS Sys. v. GE Consumer & Indus. Inc.*, 622 F.3d 361, 366 (5th Cir. Tex. 2010), quoting *On Davis*, 246 F.3d at 167. The Federal Circuit, in *Gaylord v. United States*, noted that "many circuits award actual damages based on 'the fair market value of a license covering the defendant's use.'" 678 F.3d 1339, 1343 (Fed. Cir. 2012), citing *On Davis*, 246 F.3d at 172; *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 353, 359-60 (6th Cir. 2007)(finding that a license fee was the proper measure of damages for every infringing copy of software, even those copies that were unused); *Jarvis v. K2 Inc.*, 486 F.3d 526, 533-34 (9th Cir. 2007)("in situations where the infringer could have bargained with the copyright owner to purchase the right to use the work, actual damages are

---

[2] Pursuant to 17 U.S.C. §505, the Court "may also award a reasonable attorney's fee to the prevailing party as part of costs." However, to simplify the issues presented herein, LFOW has not requested its fees and costs, though it pled a demand for both. (Doc. 1, ¶175.)

what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work."); *McRoberts Software, Inc. v. Media 100, Inc*., 329 F.3d 557, 566 (7th Cir. 2003)(affirming award of $1.2M for software development and license fees and another $900,000 in lost profits).

The LFOW Software is licensed to customers for a license fee by LFOW, which also receives fees for other services. (Doc 1. ¶36.) The overwhelming majority of revenue from the LFOW Software is the result of monthly license fees received by LFOW pursuant to the standard LFOW Software License and Services Agreement (the "LFOW Agreement"). (Doc. 1, ¶36; Ex. A, ¶7; Ex. 2 to the Shcherbakov Decl.) As shown in Section 4 of the standard LFOW Agreement, the standard license term is one year with automatic renewals. (Ex. A, ¶8; Ex. 2, LFOW_ORL001030.) The minimum standard recurring fees for customers who properly license the LFOW Software under the LFOW Agreement begin at $3,700/mo. for streaming (and increase from that point with higher amounts of data), along with a <u>separate</u> license fee of $3,200/mo. for the "virtual greeter," i.e. the display of the spokesperson video. (Ex. A, ¶8; Ex. 2, LFOW_ORL001036-37.) Accordingly, the lowest possible recurring fee for a properly-licensed version of the LFOW Software under the LFOW Agreement is $6,900/mo. ($82,800 annually). (Ex. A, ¶9.) LFOW also charges additional recurring fees, such as "click-on-me functionality," that is often purchased by LFOW customers. (Ex. A, ¶11; Ex. 2, LFOW_ORL001037.) Moreover, LFOW also receives non-recurring fees associated with creating the web spokesperson videos themselves for new LFOW customers or for customers who desire additional web spokesperson videos. (Ex. A, ¶12; Ex. 2, LFOW_ORL001035.)

It is important to note that these license fees are not speculative or inflated. These fees represent the fair market value for use of the LFOW Software, as evidenced by the acceptance of

these terms by numerous LFOW customers. LFOW has provided not only its standard form license (Ex. 2), but also three executed licenses (with client information redacted).[3] (Ex. A, ¶10; Exs. 3-5 to the Shcherbakov Decl.) The average LFOW license is far more than the $6,900/mo. sought in this case, as LFOW does not have current customers licensed under the Agreement with an average monthly fee below $10,000/mo. (Ex. A, ¶8.)

The infringing version of LFOW's Software used by Tweople's customers was analogous to the package offered by LFOW on a monthly basis. (Ex. A, ¶11.) For example, the virtual greeter described in the LFOW brochure (Ex. 2, p. 7) forms the core of the infringing version of the LFOW Software used by each Defendant. (Ex. A, ¶11.) Tweople also offered the "Click-on-me" functionality (Ex. A, ¶11; Ex. 1, p. 9; Doc. 1, ¶44 displaying "Click on me to Chat"), though this functionality was not enabled by the Defaulted Defendants (and therefore it does not form a basis for LFOW's damages claim). Tweople also included functionality akin to the LFOW "Control Desk," called the Tweople "Dashboard," which modified the infringing LFOW Software itself to change parameters for the launch and display of web spokesperson videos. (Ex. A, ¶11; Doc. 142, p. 23, ¶14.)

If the Defaulted Defendants had properly paid LFOW for its software and the accompanying services rather than contracting with Tweople, each would have incurred a video production fee and the corresponding monthly license fee. (Ex. A, ¶9, 12, 18.) The standard fee of $467.95 would have been paid by each Defaulted Defendant, as each used a 30 second video. (Ex. A, ¶12.) Additionally, the monthly license fee for the package selected by each Defaulted Defendant would have included the video streaming plan and the virtual greeter fee. (Ex. A, ¶12,

---

[3] If the Court would like to receive further evidence of the fees routinely paid by LFOW's customers, LFOW can provide unredacted copies of these licenses for in camera review along with additional customer agreements evidencing the fees paid to LFOW.

11

18; Ex. 2, LFOW_ORL001036-37.) In its normal course of business, LFOW would have demanded payment for full twelve-month licenses, which renew automatically until termination. (Ex. A, ¶8; Ex. 2, LFOW_ORL001030.) However, for the purposes of this Motion, LFOW has calculated the monthly total for each Defaulted Defendant to be conservative on its request for damages.

Without the benefit of discovery from each Defaulted Defendant, LFOW reviewed the web archive records to confirm dates when the software was being distributed by each Defaulted Defendant. The total number of months of usage is conservative, because if the infringing began during a time when there was no archive available, LFOW could not track that infringement until the following archived date. (*See, e.g*., Ex. A, ¶13, 15, 17.) The earliest archive available for Mr. Checkout that shows the distribution of LFOW's Software is from July 24, 2010. (Ex. A, ¶14.) There is no internet archive file for http://mrcheckout.net between March 1, 2010 and July 24, 2010. (Ex. A, ¶15.) Thus, it is possible that Mr. Checkout used the infringing version of LFOW's Software during these months, but to be conservative LFOW has calculated use based on the first archive file showing use of the infringing software. (*See, e.g*., Ex. A, ¶13, 15.) LFOW confirmed the link to the infringing version of LFOW's Software remained available on Mr. Checkout's website until the file was disabled in January 2014[4]. (Ex. A, ¶14.) Accordingly, Mr. Checkout used the infringing version of the LFOW Software for 42 months. (Ex. A, 15, 18.)

The first archive available for Crematory that shows the distribution of LFOW's Software is dated June 7, 2013. (Ex. A, ¶16.) LFOW confirmed the link to the infringing version of LFOW's Software remained available on Crematory's website until the file was disabled in January 2014. (*Id*.) Accordingly, Crematory used the infringing version of the LFOW Software

---

[4] The software was disabled on the server on January 15, 2014. Doc. 280, p. 4, n. 1

for 7 months. (Ex. A, ¶16, 18.) The archive available for Astles establishes the distribution of LFOW's Software began sometime before November 18, 2012. (Ex. A, ¶17.) LFOW confirmed the link to the infringing version of LFOW's Software remained available on Astles website until at least February 7, 2014. (*Id.*) Accordingly, Astles used the infringing version of the LFOW Software for at least 15 months. (Ex. A, ¶17, 18.)The table below calculates the damages attributable to the admitted infringement of each Defaulted Defendant (Ex. A, ¶18.):

| Defaulted Defendant | Video Fee | License Fee (per month based on the fee for streaming and virtual greeter) | Total License Fee for Infringement (monthly fee * months usage) | Total Damages |
| --- | --- | --- | --- | --- |
| Mr. Checkout | $467.95 | $6,900 | $289,800 | $290,267.95 |
| Crematory | $467.95 | $6,900 | $27,600 | $28,067.95 |
| Astles | $467.95 | $6,900 | $103,500 | $103,967.95 |

Based on the admitted allegations of the complaint, the standard video costs and license fees charged by LFOW during the time period of infringement, LFOW seeks damages for Defaulted Defendants Mr. Checkout, Crematory and Astles in the amounts of $290,267.95, $28,067.95 and $103,967.95, respectively. (Ex. A, ¶18.)

Respectfully submitted March 30, 2015,

/s/ Ryan T. Santurri
Ryan T. Santurri, Florida Bar No. 015698
rsanturri@addmg.com
Stephen H. Luther, Florida Bar No. 528846
sluther@addmg.com
ALLEN, DYER, DOPPELT,
MILBRATH & GILCHRIST, P.A.
255 South Orange Avenue, Suite 1401
Orlando, Florida 32801
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

**Attorneys for the Plaintiff,**
**Live Face on Web, LLC**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed with the Clerk of the Court utilizing the CM/ECF system on March 30, 2015, which will electronically transmit an electronic copy to the parties below.

/s/ Ryan T. Santurri
Ryan T. Santurri, Florida Bar No. 15698

Rebecca J. Williams
rwilliams@conroysimberg.com
Conroy Simberg Ganon Krevans
Abel Lurvey
2nd Floor
3440 Hollywood Blvd
Hollywood, FL 33021

Edmund J. Gegan
egegan@archerbay.com
Archer Bay, PA
2639 Dr. MLK Jr. St N
St Petersburg, FL 33704

Michael Leonard Leetzow
michael@leetzow.com
Michael L. Leetzow, PA
2393 Crest Ridge Ct
Sanford, FL 32771

Richard W. Smith
rsmith@fisherlawfirm.com
Fisher, Rushmer, Werrenrath, Dickson
Suite 2200
390 N Orange Ave
Orlando, FL 32801

Dale Lyn Friedman
dfriedman@conroysimberg.com
Conroy Simberg Ganon Krevans
Abel Lurvey
2nd Floor
3440 Hollywood Blvd
Hollywood, FL 33021

John A. Schifino
jschifino@burr.com
Harvey S. Kauget
hkauget@burr.com
Burr & Forman, LLP
Suite 3200
201 N Franklin St
Tampa, FL 33602

Joel L. Dion
Dion-J@BlankRome.com
Blank Rome, LLP
130 N. 18th Street
Philadelphia, PA 19103

Richard George Salazar
richard.salazar@bipc.com
Buchanan Ingersoll & Rooney PC
501 E Kennedy Blvd - Ste 1700
Tampa, FL 33604

| | |
|---|---|
| Paul J. Sodhi | David A Dorey |
| psodhi@blankrome.com | dorey@blankrome.com |
| Blank Rome, LLP | Blank Rome LLP |
| 1200 N. Federal Highway, Suite 312 | 1201 Market Street, Suite 800 |
| Boca Raton, FL 33432 | Wilmington, DE 19801 |